UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**PAUL HOWARD**,                                    Case No. 3:12 CV 752

         Plaintiff,                         Magistrate Judge James R. Knepp, II

    v.                                          MEMORANDUM OPINION AND ORDER

**CLYDE FINDLAY AREA CREDIT
UNION, INC.,**

         Defendant.

### INTRODUCTION

Plaintiff Paul Howard was the Chief Executive Officer (CEO) of Defendant Clyde Findlay Area Credit Union, Inc. (CFACU) for thirteen years. He was terminated in November 2011 following allegations that he engaged in an inappropriate relationship with Defendant's Human Resources (HR) Manager. Plaintiff filed suit in the Sandusky County Court of Common Pleas alleging age and sex discrimination along with breach of contract, claiming Defendant breached the terms of his Supplemental Executive Retirement Plan (SERP) by refusing to pay him retirement benefits. (Doc. 1-1). Defendant removed the case to this Court because the Employee Retirement Income Security Act of 1974 (ERISA) preempted and governed the contract claim. (Doc. 1, at ¶ 3); 29 U.S.C. § 1132. The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 8). The Court now considers Plaintiff's Motion to Remand or Stay (Doc. 26)[1] and Defendant's Motion for Summary Judgment (Doc. 19).[2]

---

1. Defendant filed an Opposition (Doc. 29), Plaintiff filed a Reply (Doc. 32), and Defendant filed a Sur-Reply (Doc. 34) and Supplemental Brief in Opposition (Doc. 35).

2. Plaintiff filed an Opposition (Doc. 24) and Defendant filed a Reply (Doc. 30).

# BACKGROUND

Plaintiff's Employment with Defendant Before August 2010

Plaintiff was Defendant's CEO for approximately thirteen years. (Doc. 19-2, Howard depo., at 14). He testified his duty was to manage the credit union, keep up employee morale, maintain his subordinate managers' trust and respect, and minimize workplace distractions. (Doc. 19-2, Howard depo., at 14–15). Plaintiff also described his job duties as "hiring, job assignment, promotion, performance evaluations, salary administration, administration of benefit plans . . . maintaining facilities, managing products and services, the computer support systems, accounting operations, and member service." (Doc. 24-1, at ¶ 3).

On August 26, 2004, Plaintiff and Defendant entered into the SERP (Doc. 19-4) to keep Plaintiff employed with Defendant until he retired (Doc. 19-2, Howard depo., at 20; Doc. 23, Vargas depo., at 22). The SERP was intended to "offer a designated employee . . . deferred compensation benefits . . . [and] be . . . an unfunded deferred compensation plan maintained for certain members of a select group of management or highly compensated employees[] pursuant to . . . [ERISA]." (Doc. 19-4, at 1). Defendant agreed to pay Plaintiff level, annual benefit payments of $63,178.00 commencing on August 29, 2017 and continuing until Plaintiff's death. (Doc. 19-4, at 2). The SERP also permitted Plaintiff to designate a beneficiary. (Doc. 19-4, at 3–4). Under Section 3.3, Plaintiff would forfeit his benefits if Defendant terminated him "for cause" prior to August 29, 2017. (Doc. 19-4, at 3). Among other things, the SERP defined "for cause" as "(a) the negligent or willful nonperformance of . . . duties". (Doc. 19-4, at 3). Finally, the SERP established administrative and record-keeping provisions, including a claims procedure providing a right to appeal an initial denial. (Doc. 19-4, at 4–8).

2

Board member Ron Vargas testified Plaintiff performed adequately as CEO, doubled the credit union's assets and kept it in the black, built new facilities and remodeled offices, hardly had any staff turnover, and always received salary increases. (Doc. 19-8, Vargas depo., at 9–11). He said employee morale was very good – until two years earlier, "when everything started." (Doc. 19-8, at 20–21). Previous performance evaluations showed Plaintiff did "a great job" in 2007 and represented Defendant well in the community. (Doc. 20-4, at 1). However, he showed weakness in hiring and promoting people and the Executive Committee worried he might put himself in a bad position by "not having two people present during meetings with female employees." (Doc. 20-4, at 1).

Plaintiff's Alleged Relationship with Defendant's HR Manager

Beginning around August 2010, employees noticed changes in Plaintiff's behavior. (*See generally* Doc. 19-5, Doc. 19-6, Doc. 19-7). Sonya Smith, Mae Gasa, and Joanne Vollmar observed and obtained information regarding a perceived inappropriate relationship between Plaintiff and HR Manager Hilda Koch.[3] Ultimately, the women wrote the Board a certified letter about the relationship and presented written and oral statements at a special meeting. (Doc. 19-5; Doc. 19-6; Doc. 19-7). During the relevant time period, Ms. Smith was the Senior Vice President/Chief Financial Officer (CFO) and Operations Manager (Doc. 19-5, at 1), Ms. Gasa was the Member Business Service Manager (Doc. 19-6, at 1), and Ms. Vollmar was the Vice President/Administration Manager (Doc. 19-7, at 1). As CEO, Plaintiff was all three women's immediate supervisor. (Doc. 19-5, at 1; Doc. 19-6, at 1; Doc. 19-7, at 1). He was also Ms. Koch's

---

3. At the time, Ms. Koch served in the non-management position "HR Coordinator" but essentially performed all HR functions after the HR Manager retired. (Doc. 21, Koch depo., at 8–12).

supervisor. (Doc. 21, Koch depo., at 11).

In August 2010, employees told Ms. Gasa Plaintiff changed his Facebook relationship status to "single". (Doc. 19-6, at 3). Plaintiff was divorced from his third wife shortly thereafter and employees noticed he began spending more time on the floor where Ms. Koch's office was located. ((Doc. 19-2, Howard depo., at 27–28; Doc. 19-5, at 4; Doc. 19-6, at 3; Doc. 19-7, at 3). Ms. Smith, Ms. Gasa, and Ms. Vollmar observed Plaintiff and Ms. Koch rode together to meetings, spent a lot of time behind closed doors, engaged in flirtatious behavior, and reportedly acted guilty when people saw the two of them whispering together. (Doc. 19-5, at 3; Doc. 19-6, at 3–4, 6; Doc. 19-7, at 3–5, 6). Ms. Smith stated she voiced concerns to Plaintiff and told him he was jeopardizing his career. (Doc. 19-5, at 3). Plaintiff reportedly apologized and said nothing was going on. (Doc. 19-5, at 3).

In October 2010, Plaintiff and Ms. Koch reportedly had dinner and went to a bar after a work meeting. (Doc. 19-6, at 3; Doc. 19-7, at 3). Employees and staff noticed Ms. Koch appeared to receive special attention, evidenced by Plaintiff bringing doughnuts to work when the pair shared the same shift. (Doc. 19-6, at 3; Doc. 19-7, at 4). Plaintiff also brought a personal doughnut for Ms. Koch, which "[t]he staff all noticed [] and did not approve". (Doc. 19-6, at 3; Doc. 19-7, at 4).[4] Vendors and others who interacted with Plaintiff and Ms. Koch thought the pair were dating or something was "going on" between them. (Doc. 19-5, at 7; Doc. 19-6, at 3, 5; Doc. 19-7, at 4, 7). Defendant's employees were uncomfortable with and concerned by the apparent relationship but felt intimidated and feared retaliation if they reported it. (Doc.19-5, at 2, 7; Doc. 19-6, at 6; Doc. 19-7, at 6). Ms. Gasa said "not a day would go by" without a staff member telling her how uncomfortable

---

4. The staff also perceived Plaintiff giving special treatment to Ms. Koch when he grilled for the employees and offered to customize her hamburger despite saying he would not take special requests. (Doc. 19-5, at 6).

4

they were. (Doc. 19-6, at 4). She said employees commented on multiple occasions that if someone wanted something from Plaintiff she should wear a short skirt or ask Ms. Koch. (Doc. 19-6, at 4). Before a November 2010 board meeting, Ms. Gasa said Plaintiff confronted her and accused her of gossiping about him and Ms. Koch, at which point Ms. Gasa told him "he needed to be careful" and should not ruin his career. (Doc. 19-6, at 4).

Defendant held its company Christmas party in early December 2010. (Doc. 19-6, at 4; Doc. 19-7, at 4). Ms. Vollmar and other guests observed flirtatious behavior between Plaintiff and Ms. Koch. (Doc. 19-6, at 4; Doc. 19-7, at 4). After the party, several guests gathered in a hotel room. (Doc. 19-7, at 5). Ms. Vollmar stated Ms. Koch changed into pajamas, crawled into bed, and Plaintiff laid down next to her with his arm under her neck. (Doc. 19-7, at 5). At work the following Monday, Ms. Vollmar said Plaintiff apologized to her for his behavior at the party and explained he had too much to drink. (Doc. 19-7, at 5).

Shortly after the Christmas party, Ms. Smith was promoted to CFO and Ms. Koch was promoted to HR Manager. (Doc. 19-5, at 3; Doc. 22, Smith depo., at 10–11). Other managers and staff were appalled by Ms. Koch's promotion and thought Ms. Smith had only been promoted to deflect attention from it. (Doc. 19-5, at 4; Doc. 19-6, at 4; Doc. 19-7, at 5). When one employee found out about Ms. Koch's promotion she remarked, "so you just have to sleep with the boss to get promoted around here", became very upset, and began to cry. (Doc. 19-5, at 4). Ms. Smith participated in the decision to promote Ms. Koch, however, and felt she was qualified. (Doc. 22, Smith depo., at 13). Ms. Smith and Plaintiff mutually made the decision to promote her because she had a positive attitude, some college education, and "seemed to fit into [the] philosophy" of the credit union. (Doc. 22, Smith depo., at 13–14). When the promotions were announced, Plaintiff

reportedly told the managers they needed to stop gossiping and act like leaders. (Doc. 19-5, at 3; Doc. 19-6, at 4). Plaintiff also reportedly told Ms. Gasa he could persuade the Board to see things his way and she began to feel very threatened. (Doc. 19-6, at 4–5).

The managers noticed Plaintiff and Ms. Koch frequently took days off at the same time, traveled to a conference together without informing the other managers, and spent most of the work day together. (Doc. 19-5, at 4–6; Doc. 19-6, at 4; Doc. 19-7, at 6–7). Ms. Smith noticed Ms. Koch stopped wearing her wedding band during summer 2011. (Doc. 19-5, at 5). Ms. Vollmar suspected Plaintiff and Ms. Koch spent "quite some time" in the storage unit together, noting a surveillance video technician asked if anyone could have tampered with the recording device. (Doc. 19-7, at 7). She also noticed footage appeared to be missing. (Doc. 19-7, at 7). Ms. Vollmar felt Plaintiff was singling out her and the others who complained about his behavior. (Doc. 19-7, at 8).

On September 18, 2011, Ms. Vollmar drove down the street on which Ms. Koch was rumored to live in what Ms. Gasa termed a "secret residence", saw Ms. Koch's car in a driveway, and informed Ms. Smith of her "findings." (Doc. 19-6, at 6; Doc. 19-7, at 8). Several days later, Ms. Smith drove past Ms. Koch's house, observed Plaintiff's car parked across the street, and saw the pair sitting at a table. (Doc. 19-5, at 7). Ms. Smith called Ms. Gasa, consulted with Ms. Gasa and Ms. Vollmar, and decided to call board member Rick Withem. (Doc. 19-5, at 7). The four of them drove past Ms. Koch's house again after midnight, observing all the lights were out and Plaintiff's car was still there. (Doc. 19-5, at 7; Doc. 19-6, at 6).

<u>Events Leading to Plaintiff's Termination</u>

On October 21, 2011, Ms. Smith, Ms. Gasa, and Ms. Vollmar signed and submitted a letter to the Board and stated they were "concerned about unprofessional and inappropriate behavior

6

involving the CEO and Human Resources Manager", adding it was "very apparent" Plaintiff and the HR Manager were "engaged in a relationship" that violated the Code of Conduct and Ethics Policy, "while also [a]ffecting employee morale, creating uncomfortable situations for employees[,] and creating unnecessary distractions." (Doc. 19-5, at 2). Because they feared retaliation, they asked the Board to keep the information as confidential as possible during any investigation. (Doc. 19-5, at 2). The three managers asked the Board to take swift action, explaining the "situation bec[a]me[] more problematic and distracting as each week passe[d]." (Doc. 19-5, at 2).

The Board called a special meeting in early November, at which Ms. Smith, Ms. Vollmar, and Ms. Gasa provided oral and written statements concerning Plaintiff's "unprofessional and inappropriate behavior" that "compromised the trust, respect, and integrity of the Credit Union staff and potentially the membership." (Doc. 19-5, at 1). Board chairman Mr. Vargas testified that after hearing from the managers and reading their statements, the Board felt it had to investigate and "take some corrective action". (Doc. 19-8, Vargas depo., at 5–6). Board members talked to other employees, who all said "pretty much . . . the same thing" about Plaintiff and Ms. Koch, and then met again. (Doc. 19-8, Vargas depo., at 7–8). According to Mr. Vargas, Ms. Koch denied the relationship but "the next question out of her mouth [was] 'okay, if he is fired, can I see him[?]'". (Doc. 19-8, Vargas depo., at 19). The Board did not talk to Plaintiff until it determined it had enough information to proceed. (Doc. 19-8, Vargas depo., at 8).

On November 3, 2011, Mr. Vargas invited Plaintiff to meet him for lunch, said he had received multiple complaints about an inappropriate relationship with a subordinate, and did not respond when asked who the subordinate was. (Doc. 19-2, Howard depo., at 49–50; Doc. 23-3, at 2). Plaintiff was placed on unpaid leave and informed he was no longer CEO. (Doc. 19-2, Howard

depo., at 50; Doc. 19-8, Vargas depo., at 9). Several hours later, another Board member informed Plaintiff the Board voted to terminate his employment. (Doc. 19-2, Howard depo., at 50). Mr. Vargas maintained Plaintiff was fired for cause because his behavior was unprofessional and inappropriate, he was losing trust and making his employees uncomfortable, causing distractions, putting at risk integrity, respect, and future relationships, and progressively getting worse. (Doc. 19-8, at 22–23). The credit union did not discipline Ms. Koch. (Doc. 19-8, Vargas depo., at 19–20).

After Plaintiff's Termination

Two women assumed Plaintiff's duties immediately following his termination and he was eventually replaced as CEO by Scott Hicks. (Doc. 19-8, Vargas depo., at 12). Shortly after Plaintiff's termination, his counsel wrote to Mr. Vargas inquiring whether as an ERISA based plan, the SERP benefits survived the proposed separation agreement. (Doc. 20-5, at 3). He also noted the company had not followed its HR policy for people who entered romantic relationships after their employment. (Doc. 20-5, at 3).[5] Mr. Vargas responded Plaintiff had forfeited his SERP benefits under Section 3.3(ii). (Doc. 20-9). He also stated the HR policy did not apply directly to the CEO, stating as the top management official Plaintiff was held to a higher standard. (Doc. 20-9).

On January 26, 2012, Plaintiff wrote to Defendant claiming he had been denied full and fair review as provided by ERISA and had not been given the opportunity to provide input about the reasons for his termination. (Doc. 20-5, at 2). Mr. Vargas stated they would consider the January 26,

---

5. The policy provides that people with whom employees have personal or romantic relationships with may work for "the credit union only if they will not be employed in a capacity in which one individual has a direct supervisory relationship . . . with the other or in any position in which a potential conflict of interest exists." (Doc. 19-3, at 41). Every reasonable accommodation is made, but only one employee can remain employed if reasonable accommodation cannot be made, and the employees decide who will remain. (Doc. 19-3, at 41).

2012 letter an official claim for benefits and respond to him on or before April 25, 2012. (Doc. 20-10). Plaintiff's claim for benefits was denied because he was fired for cause. (*See* Doc. 20-11). On June 20, 2012, Plaintiff requested review of the denial of benefits. (Doc. 20-11).

Plaintiff and Ms. Koch's Version of Events

Plaintiff believes he was terminated without cause in violation of the SERP. (Doc. 19-2, Howard depo., at 5). He also thinks it is "possible" he was discriminated against because of sex or age due to "the lack of due process and suddenness with which [he] was terminated." (Doc. 19-2, Howard depo., at 6, 9–10). He did not specifically think Defendant fired him so it could hire younger or female employees but felt it was unusual Ms. Koch had not been disciplined. (Doc. 19-2, Howard depo., at 13). He also believed he should have been subjected to progressive discipline. (Doc. 19-2, Howard depo., at 10). Plaintiff testified he was not aware of office rumors concerning his relationship with a female employee, did not know which female employee they accused him of having a relationship with until litigation began, and complained he "was not asked to confirm or deny" allegations about the relationship. (Doc. 19-2, Howard depo., at 6–8). He also testified he discovered "a time period of what [he] called stalking" when employees, community members, and their relatives followed him trying to detail his personal time. (Doc. 19-2, Howard depo., at 8–9).

Plaintiff said he did not have a romantic relationship with Ms. Koch. (Doc. 19-2, Howard depo., at 7–8). He claimed he became closer friends with her than with other employees and spent time with her after work. (Doc. 19-2, Howard depo, at 9, 11). He said he promoted Ms. Koch to HR Manager when the previous HR Manager retired, did not recall how many people applied for the position, and noted Ms. Koch had several years of college experience related to HR. (Doc. 19-2, Howard depo., at 11–13).

9

Ms. Koch testified Plaintiff worked closely with her when she started in the HR department because he was familiar with credit union policies. (Doc. 21, Koch depo., at 16). She said she eventually developed a platonic friendship with him. (Doc. 21, Koch depo., at 16). Ms. Koch felt Ms. Gasa, Ms. Vollmar, and Ms. Smith were stalking her to see if Plaintiff was visiting her. (Doc. 21, Koch depo., at 19). She explained Ms. Vollmar and Ms. Gasa tried to make it look like she and Plaintiff had dinner on an occasion when Ms. Koch did not even know Plaintiff was going to be there. (Doc. 21, Koch depo., at 21). Ms. Koch testified she rode alone in a car with Plaintiff for business purposes but Plaintiff also rode alone with other female employees. (Doc. 21, Koch depo., at 27). She testified she had closed door meetings with Plaintiff to discuss confidential information, noting she continues to have closed door meetings with the new CEO. (Doc. 21, Koch depo., at 27–28). Describing the Christmas party, Ms. Koch said everyone went to a hotel room and she changed into sweatpants. (Doc. 21, Koch depo., at 31–32). She said Ms. Vollmar's son was drunk, behaved inappropriately, and Plaintiff escorted him back to his room. (Doc. 21, Koch depo., at 32).

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). This burden "may be discharged by

'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## DISCUSSION

The Court first addresses Plaintiff's Motion to Remand or Stay (Doc. 26), which contends the Court lacks subject matter jurisdiction or should stay the case pending resolution of Plaintiff's administrative remedies under the SERP. For the reasons that follow, the Court denies that Motion.

Motion to Remand or Stay

The same day Plaintiff opposed Defendant's Motion for Summary Judgment, he filed a Motion to Remand or Stay the proceedings pending the appeal of his denial of benefits under the SERP. (Doc. 26). Plaintiff argues this Court lacks subject matter jurisdiction because (1) Defendant did not reference "in any way that ERISA law is applicable to the claims"; and (2) any ERISA appeal would be premature because Plaintiff has not yet exhausted his plan remedies. (Doc. 26, at 2). Plaintiff said he had not received a decision on request for review, so the case should "at least" be stayed pending determination of that request. (Doc. 26, at 2).

Defendant contends its choice not to issue a written opinion on Plaintiff's SERP appeal constituted "an affirmation of its original denial under the plain terms of the SERP." (Doc. 29, at 2). Defendant also argues the Court has subject matter jurisdiction because Plaintiff's contract claims are premised on an alleged breach of the SERP, which in its "very first paragraph" states it is governed by ERISA. (Doc. 29, at 2). Moreover, Defendant notes Plaintiff's counsel conceded ERISA applied before filing suit. (Doc. 35, at 1).

*ERISA Governs the SERP*

On November 11, 2011, several months before this litigation began, Plaintiff's counsel wrote

11

to Defendant regarding the SERP and expressly acknowledged ERISA applied to it. (Doc. 35-1). And as Defendant points out, the SERP's first paragraph states it "is intended to be a top-hat plan . . . pursuant to . . . the Employee Retirement Income Security Act of 1974." (Doc. 29-1). In March 2012, Defendant removed the case based on ERISA. (Doc. 1, at ¶ 3). Plaintiff did not dispute whether ERISA applied until nine months after Defendant removed the case – indeed, not until after Defendant filed for summary judgment. (*See* Doc. 26).

Courts follow a three-step factual inquiry to determine whether ERISA covers a non-severance employee benefit deferred compensation plan:

> First, the court must determine whether the program is exempt from ERISA coverage by the Department of Labor's "safe harbor" regulations. Second, the court must ask whether based on the surrounding circumstances a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits covered by the plan. Finally, the court must examine whether the employer established and maintained the plan [intending to provide] benefits to its employees.

*Evanoff v. Banner Mattress Co., Inc.*, 526 F. Supp. 2d 810, 815–16 (N.D. Ohio 2007).

The SERP provides for annual payments of $63,178.00 beginning on August 29, 2017. (Doc. 19-4, at 3). It does not fall into any of the safe harbor provisions. *See, e.g., Evanoff*, 526 F. Supp. 2d at 816.[6] The SERP's language also would allow a reasonable person to ascertain the intended benefits ($63,178.00 per year beginning August 29, 2017), the class of beneficiaries (Plaintiff, as the named Participant, and his beneficiary), the source of financing (an unfunded deferred

---

6. The "safe harbor" provisions exclude from ERISA (1) compensation at a rate in excess of a normal rate; (2) payment of an employee's compensation for periods during which he is physically unable to work; (3) payment of an employee's compensation for periods he does not work but is physically able; (4) payment of compensation during an employee's training; and (5) payment of compensation to an employee relieved while on sabbatical. *Id.* at 816 (citing 29 U.S.C. § 2510.3-1(b)).

compensation plan maintained for management employees), and the procedures for receiving benefits (set out in detail in Section 6.3). (Doc. 19-4); *see Evanoff*, 526 F. Supp. 2d at 816.

Finally, the SERP's stated purpose was to offer Plaintiff deferred compensation benefits pursuant to ERISA. (Doc. 19-4, at 1). There is no evidence Defendant took action contrary to that purpose or did not maintain the plan intending to provide benefits.[7] Moreover, despite Plaintiff's suggestions and citation to an Eighth Circuit case, district courts within the Sixth Circuit hold an agreement may be an ERISA plan even if it applies to only one person. *Evanoff*, 526 F. Supp. 2d at 816 n.2 (agreement not excluded from ERISA because it only applies to one person); *DuBrul v. Citrosuco North America, Inc.*, 892 F. Supp. 2d 892, 906 (S.D. Ohio 2012) ("The weight of authority indicates that one-person plans may qualify as ERISA plans") (citing cases from the Eleventh, Fourth and Seventh Circuits, and Northern and Southern Districts of Ohio).

"The hallmark of an ERISA benefit plan is that it requires an ongoing administrative program to meet the employer's obligations." *Kolkowski v. Goodrich Corp.*, 448 F.3d 843, 848 (6th Cir. 2006) (internal citations omitted); *see also Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987). Such an administrative scheme may arise when an employer assumes responsibility to pay benefits on a regular basis, thus facing "periodic demands on its assets" creating a need for "financial coordination and control." *Evanoff*, 526 F. Supp. 2d at 815 (internal citations omitted). Plaintiff argues the SERP does not involve an ongoing administrative program (Doc. 32, at 2), but annual payments certainly impose an obligation to pay benefits on a regular basis, resulting in periodic rather than one-time demands on assets. (*See* Doc. 34, at 3). The SERP's annual payment

---

7. At his deposition, Board member Mr. Vargas testified the funding for the SERP was still available as far as he knew. (Doc. 23, Vargas depo., at 11–12).

terms, record keeping requirements, and tax reporting requirements establish it as an ongoing administrative scheme rather than a "one-time lump-sum payment triggered by a single event requir[ing] no administrative scheme". *See Fort Halifax Packing Co., Inc.*, 482 U.S. at 12. The SERP meets the requirements to qualify as an ERISA plan, expressly states it is an ERISA plan, and Plaintiff's counsel acknowledged it was an ERISA-governed plan before this case was filed. The Court finds ERISA governs the SERP and subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.[8] Therefore, the Court denies Plaintiff's Motion to Remand the case to state court.

*Plaintiff Exhausted His Administrative Remedies*

Plaintiff also asks the Court to stay the case pending results from the administrative appeal of his claim denial. He further argues Defendant did not comply with appropriate procedures. (Docs. 26, 32). However, the SERP's procedure for notification of a denied claim appears to track the regulatory claims procedures. More importantly, even if the SERP's appeals process did not comply with regulatory requirements or Defendant's behavior otherwise fell short, federal regulations provide in those circumstances, a claimant is deemed to have exhausted administrative remedies, making a civil case appropriate. 29 C.F.R. § 2560.503-1(l).

Under the regulations, notification of a benefit determination must be provided in writing, set forth specific reasons for the denial, refer to the plan provision forming the basis for the denial,

---

8. Plaintiff argues Defendant did not treat the SERP as an ongoing administrative program because it determined Plaintiff forfeited benefits prior to receiving an official claim for benefits. (*See* Doc. 32, at 3; Doc. 20-9; Doc. 20-10). While Plaintiff's counsel's initial letter regarding the separation agreement and the SERP did not present an official claim for benefits, it did ask whether the benefits survived Plaintiff's termination. (Doc. 20-5, at 3). It seems reasonable for Defendant to have responded with its belief that Plaintiff forfeited benefits. Moreover, when the SERP clearly established an ongoing administrative program, this communication suggesting the outcome of Plaintiff's eventual claim does not change the SERP into a non-ERISA plan.

14

describe any additional information necessary for the claimant to perfect the claim and explain why the material is needed, and describe the appeal procedure. 29 C.F.R. § 2560.503-1(g)(1)(i)–(iv). A full and fair review must give the claimant the opportunity to submit information relating to the claim; provide for the claimant to be given, upon request and free of charge, reasonable access to and copies of information relevant to his claim; and provide review that takes into account all information submitted by the claimant. 29 C.F.R. § 2560.503-1(h)(2)(i)–(iv). Written notification of the determination on review must be given to the claimant within 60 days of the request for review, or 120 days if there are special circumstances. 29 C.F.R. § 2560.503-1(i)(1)(i).

In this case, the SERP establishes a claims and appeal procedure. The claimant presents a claim in writing and the employer responds in writing within 90 days, states the specific reason for denial (referring to the SERP provision forming the basis for denial), describes of any additional information necessary to perfect the claim, explains why the material is necessary, and explains the claims review procedure. (Doc. 19-4, at 4–5). A denied claimant may submit a written request for review, after which the employer reviews the claim and notifies the claimant of the decision within 60 days, or 120 days if there are special circumstances. (Doc. 19-4, at 5). Like the initial notice of denial, the SERP provides that the decision on review will be in writing and state the specific reasons for the decision, with references to the SERP provision on which the decision is based. (Doc. 19-4, at 5). If a decision on review is not communicated within the specified time limits, the claim shall be deemed denied upon review and the decision will be final and binding. (Doc. 19-4, at 5). This is consistent with 29 C.F.R. § 2560.503-1(l), which states if a plan fails to follow claims procedures consistent with regulations, the claimant is deemed to have exhausted his administrative remedies and is entitled to pursue a civil action.

15

On April 25, 2012, Defendant sent a letter within applicable time limits indicating Plaintiff's claim had been denied because he was terminated for cause. (*See* Doc. 20-11).  On June 20, 2012, Plaintiff requested review. (Doc. 20-11). He never received written notification of the review decision, which under the SERP means the claim is deemed denied. Under 29 C.F.R. § 2560.503-1(l), the administrative proceedings have concluded because even if the SERP did not entirely comply with regulatory requirements, the next step is a civil action like this one. The Court therefore denies Plaintiff's Motion to Stay the case and proceeds to Defendant's Motion for Summary Judgment.

Plaintiff's Sex Discrimination Claim

Plaintiff alleges Defendant discriminated against him because of sex in violation of Ohio Revised Code §§ 4112.02(A). (Doc. 1-1, at ¶ 11–16). Defendant contends it is entitled to summary judgment because Plaintiff was replaced by a man, cannot establish a disparity in treatment between himself and similarly situated females, cannot establish pretext, and cannot show Defendant is the unusual employer who discriminates against the majority. (Doc. 19-1, at 9–13).

Revised Code § 4112.02(A) makes it unlawful for any employer "because of the . . . sex . . . of any person, to discharge without just cause . . . or otherwise discriminate against that person". Evidence sufficient to support a finding of discrimination under Title VII must exist to find a violation of § 4112.02(A). *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Little Forest Medical Ctr. of Akron v. Ohio Civ. Rights Comm.*, 61 Ohio St.3d 607, 609 (1991). A plaintiff can establish discrimination using direct evidence – which requires more than conjecture and covers only blatant remarks – or indirect evidence, which triggers the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Southworth v. N. Trust*

16

*Sec., Inc.*, 195 Ohio App.3d 357, ¶ 4 (Ohio Ct. App. 2011); *Karsnak v. Chess Financial Corp.*, 2012-Ohio-1359, ¶ 15–16 (Ohio Ct. App. 2012). Here, Plaintiff does not allege direct evidence of sex discrimination and thus must proceed under the burden-shifting framework.

The *McDonnell Douglas* analysis first requires Plaintiff to establish a prima facie case of discrimination by showing he (1) belonged to the protected class, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) was replaced by a person of the opposite sex, or similarly situated opposite-sex employees were treated more favorably. *See McDonnell Douglas*, 411 U.S. at 802; *Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 721, 723 (N.D. Ohio 2008). In a reverse discrimination case where the plaintiff is a member of the majority, he must demonstrate background circumstances supporting "the suspicion that the defendant is that unusual employer who discriminates against the majority" and evidence the employer treated similarly situated employees who were not members of the protected class differently. *Hout*, 550 F. Supp. 2d at 721 (internal citations omitted); *Silberstein v. Montgomery Cnty. Comm. College*, 2009 WL 3977080, ¶ 49 (Ohio Ct. App. 2009). If the plaintiff meets his prima facie burden, a burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, after which the plaintiff must show the proffered reason is a pretext for unlawful discrimination. *Hout*, 550 F. Supp. 2d at 721–22.

*Plaintiff Cannot Establish A Prima Facie Case of Sex Discrimination*

Defendant is entitled to summary judgment on Plaintiff's sex discrimination claim because Plaintiff cannot establish a prima facie case. He was not replaced by a woman, was not treated less favorably than a similarly situated female, and has not shown Defendant is the unusual employer that discriminates against the majority.

17

Although immediately after Plaintiff's termination his duties were assumed by two women, the CEO position was permanently filled with another male. (Doc. 23, Vargas depo., at 12). Plaintiff claims a female – specifically Ms. Koch – was treated more favorably than him. (Doc. 24, at 8–11). Defendant did take different actions with respect to Plaintiff and Ms. Koch. They fired Plaintiff, while Ms. Koch remains employed and did not suffer a disciplinary action. (Doc. 20, Howard depo., at 49–51; Doc. 23, Vargas depo., at 9, 19–20). But establishing a prima facie case requires more than this. Plaintiff must show not only that Ms. Koch was treated differently, but that she was "nearly identical" to Plaintiff such that she was similarly situated to him in all relevant aspects of employment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351–52 (6th Cir. 1998). This does not mean their employment statuses must have been identical; but a plaintiff and his proposed comparator must have engaged in acts of comparable seriousness and the court may consider whether the individuals dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of it." *Colvin v. Veterans Admin. Medical Center*, 390 F. App'x 454, 458 (6th Cir. 2010); *Ercegovich*, 154 F.3d at 352.

Here, Plaintiff argues he was similarly situated to Ms. Koch because they were accused of acts of comparable seriousness and his duties as CEO overlapped somewhat with Ms. Koch's duties as HR Manager. (Doc. 24, at 9–11; Doc. 24-1, at ¶ 3–4). While their duties did overlap in certain areas, Plaintiff was the CEO – the top management official responsible for overseeing the entirety of Defendant's business and representing Defendant in the community. (Doc. 19-2, Howard depo., at 14; Doc. 20-4, at 1; Doc. 24-1, at ¶ 3). The other managers, including Ms. Koch, reported to him and he directly supervised their work. (Doc. 19-5, at 1; Doc. 19-6, at 1; Doc. 19-7, at 1; Doc. 21,

18

Koch depo., at 11). As CEO, Plaintiff was responsible for keeping up employee morale, maintaining his subordinates' trust and respect, and minimizing workplace distractions. (Doc. 19-2, Howard depo., at 14–15). Moreover, the Sixth Circuit has held supervisory and non-supervisory employees are not similarly situated, employees with different job responsibilities may not be similarly situated, and differences in job title and responsibilities, experience, and disciplinary history may show two employees are not similarly situated. *Rutherford v. Britthaven*, 452 F. App'x 667, 672 (6th Cir. 2011) (citing *Quinn-Hunt v. Bennett Enters., Inc.*, 211 F. App'x 452, 459 (6th Cir. 2006); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994); *Russell v. Ohio Dep't of Admin. Servs.*, 302 F. App'x 386, 391 (6th Cir. 2008); *Campbell v. Hamilton Cnty.*, 23 F. App'x 318, 325 (6th Cir. 2001)).

Put simply, the CEO is not similarly situated to the HR Manager he hired and directly supervised, despite some overlap in duties. Plaintiff was responsible for all aspects of the company, hired, promoted, and supervised all the managers – including the one he was alleged to have a romantic relationship with – and had an underlying duty to foster an environment of respect and integrity while maintaining employee morale and minimizing distractions. This slew of additional responsibilities placed his job in an entirely different class than Ms. Koch's such that they were not similarly situated in all relevant aspects of employment. Therefore, Plaintiff cannot show Defendant treated a similarly situated female employee more favorably and cannot establish a prima facie case of sex discrimination.[9]

---

9. Plaintiff noted Defendant failed to follow the policy its HR Manual sets out regarding relationships between employees. (Doc. 24, at 3). But the Manual is a resource for managers explaining how to address human resource issues within the staff and Board member Mr. Vargas testified it did not apply to the CEO. (Doc. 19-3, at 2; Doc. 23, Vargas depo., at 9).

Further, Plaintiff cannot show Defendant is the unusual employer who discriminates against the majority. Despite the evidence he submitted showing he was Defendant's only male employee during his tenure as CEO (Doc. 24-1, Ex. A), both his predecessor and successor as CEO were men (Doc. 19-8, Vargas depo., at 12; *see* Doc. 30, at 5). Moreover, Plaintiff was the one responsible for hiring Defendant's employees and thus cannot show background circumstances showing Defendant and its Board engaged in reverse sex discrimination. (Doc. 24-1, at ¶ 3).

*Plaintiff Cannot Show Pretext*

Even if Plaintiff managed to assert a prima facie case of sex discrimination, Defendant is still entitled to summary judgment. Defendant proffered a legitimate business reason for terminating Plaintiff: He "lost the morale, trust[,] and respect of his subordinates . . . was a source of distraction . . . and exposed the Credit Union to unnecessary legal liability . . . [running] afoul of CFACU's Core Values. Without trust, respect[,] and integrity, [Plaintiff] could not function effectively as CEO." (Doc. 19-1, at 13). To show this reason was a pretext to cover unlawful sex discrimination, Plaintiff would have to show the proffered reason had no basis in fact, did not actually motivate his termination, or was insufficient to motivate the adverse action. *Harris v. Metro. Gov't of Nashville and Davidson County*, 594 F.3d 476, 486 (6th Cir. 2010). He cannot show any of those things. First, Plaintiff only believed it was "possible" his sex influenced his termination. (Doc. 19-2, Howard depo., at 5). Further, Plaintiff's past successful performance did not prevent Defendant from terminating him when it concluded his current conduct – which led managers to inform the Board employees no longer respected him, were uncomfortable working for him, and feared retaliation if they spoke against him – prevented him from performing effectively as CEO. Plaintiff was fired for a legitimate business reason, replaced by a man, and not treated less favorably than similarly situated

20

females. There simply is no evidence Defendant terminated Plaintiff because he was a man and not because it felt he could no longer lead the company.

Plaintiff cannot establish a prima facie case of sex discrimination and even if he could, he cannot rebut Defendant's proffered legitimate business reason with evidence of pretext. The Court therefore grants summary judgment to Defendant on Plaintiff's sex discrimination claim.

Plaintiff's Age Discrimination Claim

Plaintiff also alleges Defendant discriminated against him because of age, violating Revised Code §§ 4112.02(A). (Doc. 1-1, at ¶ 20–24).[10] Defendant moved for summary judgment arguing Plaintiff could not establish a prima facie case because there was no disparity in treatment of a similarly situated person. (Doc. 19-1, at 11). Defendant contends no other employee was similarly situated, further arguing it had a legitimate business reason to terminate Plaintiff and he cannot show the reason was a pretext for age discrimination. (Doc. 19-1, at 11–13).

*Plaintiff Has Established a Prima Facie Case of Age Discrimination*

Age discrimination claims brought under Ohio law are "analyzed under the same standards as federal claims brought under the Age Discrimination in Employment Act ('ADEA')." *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 995 (6th Cir. 2009)). Like his sex discrimination claim, Plaintiff has no direct evidence of age discrimination and must show he was (1) a member of the statutorily protected class, (2) discharged, (3) qualified for the position, and (4) replaced by, or the discharge permitted retention of, a person of substantially younger age, or similarly situated non-protected

---

10. Revised Code § 4112.14 elaborates on Ohio's age discrimination statute, prohibiting employers from discharging without just cause employees 40 or older who can otherwise perform the job.

21

people were treated differently. *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 180 (2004). If Plaintiff establishes a prima facie case, Defendant must articulate a legitimate, nondiscriminatory reason for its decision. Plaintiff then bears the burden of showing Defendant's reason is a pretext for unlawful discrimination.

Plaintiff was 59 years old when Defendant terminated him and thus within the statutorily protected class. (Doc. 20, Howard depo., at 21; Doc. 23-3, at 2; Doc. 24-1, at ¶ 2); Revised Code § 4112.14. His employment was terminated, and Defendant does not argue Plaintiff was not objectively qualified to be CEO. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575–76 (6th Cir. 2003). Two female employees assumed Plaintiff's duties immediately after his termination, and he was replaced when 45 year old Scott Hicks took over as CEO. (*See* Doc. 23, Vargas depo., at 12; Doc. 24, at 7). The Ohio Supreme Court does not define "substantially younger", *Coryell*, 101 Ohio St.3d at 181–82, but the Sixth Circuit holds an age difference of ten years is generally significant and a difference of six and a half years can be significant. *Blizzard*, 698 F.3d at 284 (citing *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)); *see also Evanoff v. Banner Mattress Co., Inc.*, 2008 WL 4683300, *13–14 (N.D. Ohio 2008) (age difference of seven years may be substantial). Mr. Hicks is approximately 15 years younger than Plaintiff, making him substantially younger. Thus, Plaintiff has established a prima facie case of age discrimination.

*Plaintiff Cannot Show Pretext*

Because Plaintiff established a prima facie case, the burden shifts to Defendant to articulate a nondiscriminatory legitimate business reason for his termination. *See Blizzard*, 698 F.3d at 284. Defendant's legitimate business reason for terminating Plaintiff was that he "lost the morale, trust[,] and respect of his subordinates . . . was a source of distraction . . . and exposed the Credit Union to

22

unnecessary legal liability . . . [running] afoul of CFACU's Core Values. Without trust, respect[,] and integrity, [Plaintiff] could not function effectively as CEO." (Doc. 19-1, at 13).

"When an employer offers nondiscriminatory reasons for an adverse employment action," it is the plaintiff's "burden to produce sufficient evidence from which a jury could reasonably reject" the employer's explanation. *Blizzard*, 698 F.3d at 285 (internal citations omitted). To accomplish this, the plaintiff may show the proffered reason had no basis in fact, did not actually motivate the discharge, or was insufficient to motivate the discharge. *Id.* Ultimately, pretext is a commonsense inquiry: "Did the employer fire the employee for the stated reason or not?" *Id.*

Defendant's proffered reasons for terminating Plaintiff certainly had a basis in fact. Three managers approached the Board with detailed statements explaining why they no longer trusted or respected him. (Doc. 19-5; Doc. 19-6; Doc. 19-7). The Board discussed the matter with other employees at the credit union and everyone "pretty much sa[id] the same thing as far as what was going on". (Doc. 23, Vargas depo., at 6–8). Plaintiff's subordinates no longer respected him and he had become a workplace distraction, disrupting Defendant's business. (Doc. 19-11; *see also* Doc. 19-5; Doc. 19-6; Doc. 19-7). When the Board approached Ms. Koch, she denied having a romantic relationship with Plaintiff – yet immediately asked if she *could* have a romantic relationship with him if the Board fired him. (Doc. 23, Vargas depo., at 19). Moreover, Plaintiff himself admitted or

23

failed to expressly deny a number of the behaviors leading the staff to approach the Board.[11] And despite Plaintiff's complaint that Defendant did not question him about the allegations, an employer's decisional process need not "be optimal or . . . leave no stone unturned." *Blizzard*, 698 F.3d at 286.

Plaintiff argues Defendant "could not honestly believe" it might face liability under a sexual harassment suit, yet Plaintiff testified he acknowledged the risk of a harassment suit if a CEO engaged in a romantic relationship with someone he promoted. (Doc. 20, Howard depo., at 86). Plaintiff also argues he was not actually involved in a romantic relationship with Ms. Koch and urges the Court to find this significant. (Doc. 24, at 14). However, as long as an employer honestly believed its proffered reason and reasonably relied on the particularlized facts before it when it made the decision, an employee cannot establish a given reason was pretextual even if it ultimately proves to be factually incorrect. *Blizzard*, 689 F.3d at 286; *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).

Moreover, Defendant's proffered reason actually motivated his termination. The three managers approached the Board October 21, 2011. (Doc. 19-10). The Board met with them soon

---

11. Plaintiff admitted he spent time with Ms. Koch after hours and at her residence, shopped with her and bought her clothing, probably became closer friends with her after his divorce while she was going through a divorce, was closer friends with her than anyone else at the credit union, and had in the past been told he should always have another person present when he met with female employees. (Doc. 20, Howard depo., at 9, 11, 31–33, 36, 40, 47–48). He also "believe[d]" Ms. Koch called him "Sparky". (Doc. 20, Howard depo., at 31). He could not recall whether the following things happened: the Board told him an HR Manager was not necessary, he confronted managers for talking about his relationship with Ms. Koch, he was told not to ruin his career over Ms. Koch, he told female subordinates they had no class and were not leaders, he brought Ms. Koch a separate doughnut, he laid down on a bed next to Ms. Koch after the Christmas party, he was drunk at the Christmas party, he apologized to his subordinates after the Christmas party, the party occurred a week before he promoted Ms. Koch, or how many people submitted their resumes for the HR Manager position. (Doc. 20, Howard depo., at 12, 29–31, 34–36).

24

after and conducted an investigation. (Doc. 23, Vargas depo., at 6–8; Doc. 23-3, at 1). The Board then told Plaintiff he was suspended without pay because of the allegations. (Doc. 20, Howard depo., at 50–51; Doc. 23, Vargas depo., at 8–9; Doc. 23-3, at 2). By November 3, 2011, Plaintiff's employment had been terminated. (Doc. 20, Howard depo., at 50; Doc. 23-3, at 2–3). The Board faced significant evidence showing Plaintiff could no longer effectively lead the credit union or manage his employees, and Plaintiff was required to put forth evidence demonstrating Defendant "did not honestly belief" its proffered nondiscriminatory reason. *Blizzard*, 698 F.3d at 286. He has not done this and has not met his burden to show "illegal motivation was *more* likely than that offered by the defendant." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original).

To establish pretext via insufficiency, Plaintiff bears the burden of showing to the jury "by a preponderance of the evidence that other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct . . . without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it". *Blizzard*, 698 F.3d at 286–87 (citing *Manzer*, 29 F.3d at 1084; *Ercegovich*, 154 F.3d at 352). Even viewing the evidence in the light most favorable to Plaintiff, there is simply not evidence before the Court upon which a reasonable jury could make this determination.

Plaintiff argues Defendant's proffered reason was insufficient to motivate his termination because he previously performed well, was not romantically involved with Ms. Koch, was villainized when he tried to discuss rumors with employees, and the credit union was a friendly place where hugging, nicknames, riding in cars with coworkers, or exchanging gifts were not uncommon.

25

(Doc. 24, at 14–16). Plaintiff only identified Ms. Koch as a similarly situated younger person treated more favorably than him, (Doc. 24, at 8–11), and the Court has already determined Ms. Koch was not similarly situated. As such, Plaintiff has offered no evidence showing Defendant's proffered reason was a cover-up for age discrimination.  Further, Plaintiff's testimony shows he only thought it was possible his age influenced his termination, and he only thought this because he felt additional procedures should have been followed – despite understanding Defendant was under no obligation to follow progressive discipline. (Doc. 20, Howard depo., at 9–10, 38–39). It was Plaintiff's burden to offer evidence of pretext, and he failed to meet that burden. The Court therefore grants Defendant's Motion for Summary Judgment on Plaintiff's age discrimination claim.

Breach of Contract Claims

Plaintiff alleges he was not fired for cause and Defendant breached the SERP by failing to provide retirement benefits. (Doc. 1-1, at ¶ 18). Further, Plaintiff alleges the character of his employment, custom, and course of dealing between himself and Defendant established an implied contract that Plaintiff could only be terminated for cause. (Doc. 1-1, at ¶ 26). Because he contends he was terminated without cause, he argues Defendant breached this implied contract. (Doc. 1-1, at ¶ 27). Defendant requests summary judgment on this claim as well. (Doc. 19-1, at 13–15).

Under the SERP, Plaintiff forfeited his benefits if he was terminated for cause prior to August 29, 2017. (Doc. 19-4, at 2–3). "For cause" included "the negligent or willful nonperformance of [his] duties". (Doc. 19-4, at 3). Defendant argues Plaintiff was terminated because he lost the trust and respect of subordinate managers, including the CFO, and became an ineffective leader, causing the business to fail to operate as a team. (Doc. 19-1, at 14–15). Defendant states Plaintiff's conduct in the face of warnings from managers "quashed [his] ability to lead" and therefore "was the

26

embodiment" of negligent or willful nonperformance. (Doc. 19-1, at 15).

Plaintiff's duties included hiring, job assignments, promotion, performance evaluations, salary administration, administration of benefit plans, and all other aspects of credit union management. (Doc. 24-1, at ¶ 3). Using this job description, Plaintiff argues he performed well. (*See* Doc. 23, Vargas depo., at 9–10; Doc. 24, at 17). Plaintiff believes Defendant overlooked this "stellar track record" and relied on idle gossip to terminate him. (Doc. 24, at 17). As Defendant points out, however, Plaintiff does not dispute "that three managers complained vociferously" about his performance. (Doc. 30, at 8). Moreover, Plaintiff ignores Mr. Vargas's testimony that employee morale was only good until the staff began to perceive an inappropriate relationship between Plaintiff and Ms. Koch. (Doc. 23, Vargas depo., at 20–21).

During his deposition, Plaintiff acknowledged his role as CEO required him to keep up employee morale, maintain his subordinate managers' trust, minimize workplace distractions, and have the respect of his subordinates. (Doc. 19-2, Howard depo., at 14–15). Plaintiff does not dispute he lost the trust and respect of three managers. Though he claims *he* was unaware of staff complaints, he does not contest Ms. Gasa's statements that employees complained to her about his behavior every day. (Doc. 19-6, at 4). The evidence shows that regardless of whether Plaintiff and Ms. Koch actually had a romantic relationship, his managers and staff were preoccupied with the relationship they perceived, to the point it negatively impacted the workplace. Rampant gossip spread through the office; staff complained; people felt uncomfortable talking to Plaintiff and Ms. Koch when they were together, believed Ms. Koch was promoted only because of her relationship with Plaintiff, and were upset he appeared to favor her; and people felt intimidated by Plaintiff. (Doc. 19-5, at 4–7; Doc. 19-6, at 3–6; Doc. 19-7, at 3–6). Ms. Smith once took time out of her work

27

day to count how many times in a four-hour period Plaintiff went upstairs, presumably to visit Ms. Koch. (Doc. 19-5, at 4). The managers fielded complaints and questions from employees and vendors. (Doc. 19-5, at 4–5, 7; Doc. 19-6, at 3–5; Doc. 19-7, at 4–5, 7). The discord spilled over into activities after work hours as well, with Ms. Smith, Ms. Gasa, Ms. Vollmar, and others carefully observing Plaintiff and Ms. Koch at social events or their homes, looking for and seeing signs of inappropriate behavior. (*See generally* Doc. 19-5; Doc. 19-6; Doc. 19-7).

The affidavits and supporting documentation from Ms. Smith, Ms. Gasa, and Ms. Vollmar, along with Mr. Vargas's testimony, demonstrate Plaintiff's behavior weakened employee morale, caused significant distractions, and impaired his ability to function effectively as CEO. Moreover, Plaintiff failed to deny a number of factual allegations. Specifically, Plaintiff could not recall whether: (1) the Board thought an HR Manager was unnecessary; (2) he confronted managers for gossiping about his relationship with Ms. Koch; (3) a manager told him not to ruin his career over Ms. Koch; (4) he told female leaders they were not leaders and had no class; (5) he was drunk at the Christmas party, laid down on a bed with Ms. Koch after the party, and apologized to others for his behavior; or (6) coworkers gossiped about his Facebook relationship status change in fall 2010. (Doc. 20, Howard depo., at 29–36, 87).

Plaintiff also admits the following things: (1) He was probably closer to Ms. Koch than anyone else at the credit union; (2) they probably became closer friends after he divorced his third wife, while Ms. Koch was going through a divorce; (3) he and Ms. Koch attended an HR seminar together; (4) he went shopping with Ms. Koch and may have bought her a scarf she liked; (5) he spent time with Ms. Koch after hours and at her residence; (6) the Board previously instructed him he should have two people present during meetings with female employees; and (7) he believed Ms.

28

Koch called him "Sparky" (though he could not recall why she called him this). (Doc. 20, Howard depo., at 9, 11, 31–36, 40, 48, 87).[12]

Plaintiff's admissions or failure to deny a number of the contentions regarding his behavior, undisputed evidence his CFO and other employees no longer respected him, and the negative, distracting effect on Defendant's day-to-day operations establish a negligent failure to perform his duties as CEO. Defendant's employees did not feel comfortable at work, feared retaliation, and managers had to field constant complaints and questions, creating a continual distraction. Defendant terminated Plaintiff for cause pursuant to the SERP and is entitled to summary judgment on his breach of contract claims.[13]

### CONCLUSION

The Court DENIES Plaintiff's Motion to Remand or Stay. Because no genuine issues of material fact exist and Defendant is entitled to judgment as a matter of law on each claim, the Court GRANTS Defendant's Motion for Summary Judgment. The case is dismissed.

IT IS SO ORDERED.

_____s/James R. Knepp II_____
United States Magistrate Judge

---

12. In addition to the evidence from Plaintiff's deposition in which he could not remember confronting people about workplace gossip, Plaintiff's Opposition to Defendant's Motion noted "when he discussed the rumors with the employees in an attempt to cease the gossip, [he] was villanized", which at least suggests he may in fact have been aware of gossip and the impact it had. (Doc. 24, at 17).

13. Plaintiff's breach of implied contract claim is premised on the notion that Defendant could not fire him without cause, but this issue is moot because Plaintiff *was* terminated for cause.